**Harold PEARSALL, Appellant,**

v.

**Joe ALEXANDER, Appellee.**

No. 87–826.

District of Columbia Court of Appeals.

Argued Feb. 28, 1990.

Decided March 22, 1990.

**114**

Richard L. Fields, Oxon Hill, Md., for appellant.

Joseph Levin, Washington, D.C., for appellee.

Before NEWMAN, FERREN, and FARRELL, Associate Judges.

NEWMAN, Associate Judge:

In what must be a common development wherever there are state-sponsored lotteries, this is the story of two friends who split the price of a ticket only to have the ticket win and split their friendship.

Harold Pearsall appeals from the dismissal of his complaint against Joe Alexander, in which Pearsall claimed breach of an agreement to share the proceeds of a winning D.C. Lottery ticket worth $20,000. The trial court found that such an agreement did, in fact, exist, but determined that the agreement was invalid under § 1 of the Statute of Anne, as enacted in D.C.Code § 16–1701 (1989 Repl.). We conclude that the trial court erred in applying § 16–1701 to the Pearsall–Alexander agreement and, therefore, we reverse and remand with instructions to enter judgment for the appellant.

## I.

Harold Pearsall and Joe Alexander were friends for over twenty-five years. About twice a week they would get together after work, when Alexander would meet Pearsall at the Takoma Metro station in his car. The pair would then proceed to a liquor store, where they would purchase what the two liked to refer to as a "package"—a half-pint of vodka, orange juice, two cups, and two lottery tickets—before repairing to Alexander's home. There they would "scratch" the lottery tickets, drink screwdrivers, and watch television. On occasion these lottery tickets would yield modest rewards of two or three dollars, which the pair would then "plow back" into the purchase of additional lottery tickets. According to Pearsall, the two had been sharing D.C. Lottery tickets in this fashion since the Lottery began.

On the evening of December 16, 1982, Pearsall and Alexander visited the liquor store twice, buying their normal "package" on each occasion. The first package was purchased when the pair stopped at the liquor store on the way to Alexander's home from the Metro station. Pearsall went into the store alone, and when he returned to the car, he said to Alexander, in reference to the tickets, "Are you in on it?" Alexander said "Yes." When Pearsall asked Alexander for his half of the purchase price of the tickets, Alexander replied that he had no money. When they reached Alexander's home, Alexander, expressing his anxiety that Pearsall might lose the tickets, demanded that Pearsall produce them, snatched them from Pearsall's hand, and "scratched" them, only to find that both were worthless.

At about 8:00 p.m. that same evening, Alexander, who apparently had come by some funds of his own, returned to the liquor store and bought a second "package". This time Pearsall, who had been offended by Alexander's conduct earlier in taking both tickets, snatched the two tickets from Alexander and announced that he would be the one to "scratch" them. Intending only to bring what he regarded as Alexander's childish behavior to Alexander's attention, Pearsall immediately relented and gave over one of the tickets to Alexander. Each man then "scratched" one of the tickets. Pearsall's ticket proved worthless; Alexander's was a $20,000 winner.

Alexander became very excited about the ticket and began calling friends to announce the good news. Fearing that Alexander might lose the ticket, Pearsall told Alexander to sign his name on the back of

the ticket. Subsequently, Alexander cashed in the ticket and received the winnings; but, when Pearsall asked for his share, Alexander refused to give Pearsall anything.

Pearsall brought suit against Alexander, claiming breach of an agreement to share the proceeds of the winning ticket. Alexander denied that there was any agreement between the two to share the winnings of the ticket and further claimed, *inter alia,* that any such agreement was unenforceable because it was not in writing and contravened public policy.

The trial court dismissed Pearsall's complaint on the public policy grounds raised by Alexander, finding that the enforcement of contracts arising from gaming transactions is barred by the Statute of Anne, as enacted in D.C.Code § 16–1701, even when such contracts concern legalized gambling. Citing *Hamilton v. Blankenship*, 190 A.2d 904 (D.C.1963), for this latter proposition, the trial court went on to determine that § 16–1701 applies to bets placed legally within the District pursuant to D.C.Code § 2–2501 to 2537, which authorizes the D.C. Lottery. The court did not reach the issue of whether such an agreement must be in writing pursuant to the Statute of Frauds, as enacted in D.C.Code § 28:1–206 (1981).

## II.

### A.

■ The Statute of 9 Anne, ch. 14, § 1 (1970), as enacted in the District of Columbia,[1] provides, in relevant part, as follows:

**§ 16–1701. Invalidity of gaming contracts.**

(a) A thing in action, judgment, mortgage, or other security or conveyance made and executed by a person in which any part of the consideration is for money or other valuable thing won by playing at any game whatsoever, or by betting on the sides or hands of persons who play, or for the reimbursement or payment of any money knowingly lent or advanced for the purpose, or lent or advanced at the time and place of play or bet, to a person so playing or betting or who, during the play, so plays or bets, is void except as provided by subsection (b) of this section.

D.C.Code § 16–1701. Thus, the statute invalidates only those contracts in which one party agrees either to (1) pay something to another as the result of losing a game or bet, or (2) repay money knowingly advanced or lent for the purpose of gambling. *Hamilton v. Blankenship, supra,* 190 A.2d 904.

Pearsall's cause of action does not involve either of these types of transactions. First, he is not suing Alexander to recover a gambling debt owed by Alexander. Pearsall and Alexander did not wager against one another on the outcome of the D.C. Lottery or any other event, and they did not play against one another at cards, dice, or any other game. Second, Pearsall is not suing to recover money loaned to Alexander for the purpose of gambling. Rather Pearsall and Alexander entered into an agreement to share the winnings of a jointly-purchased lottery ticket, and it is this agreement, and not any gaming contract, that forms the basis of Pearsall's cause of action. Thus, the nature of the Pearsall–Alexander agreement removes it from the ambit of *Hamilton v. Blankenship, id.,* upon which the trial court relied.[2]

---

1. The Statute of Anne, enacted in England in 1710, outlawed certain forms of wagering, permitted losers to recover their gambling losses, and denied winners the use of judicial process to collect from recalcitrant losers. *LaFontaine v. Wilson,* 185 Md. 673, 45 A.2d 729, 732 (1946). This latter goal was addressed in § 1 of the Statute, which declared as void all contracts growing out of gambling transactions. *D.C. Code Encyclopedia,* § 16–1701 (1966). § 1 of the Statute of Anne was adopted in the District of Columbia, D.C.Code, 1961 Ed., § 16–1701 (9

Anne, 14, § 1, 1710; Kilty's Rept., p. 248; Alex. Brit.Stat., p. 689; Comp.Stat.D.C., p. 243, § 12), where it continues to apply, D.C.Code § 16–1701 (1989), *Hamilton v. Blankenship, supra,* 190 A.2d 904, except where it is inconsistent with or repealed by subsequent law. *Wirt v. Stubble-field,* 17 App.D.C. 283 (1900).

2. *Hamilton* concerned an agreement by a D.C. resident to repay a Maryland restauranteur the loan of some $1600 in coins knowingly advanced for the purpose of playing slot ma-

Moreover, the Pearsall–Alexander agreement is not based upon the type of consideration described in the § 16–1701, *i.e.*, money or valuables won at gambling or knowingly loaned for the purpose of gambling. Rather, each man gave as consideration for the agreement his promise to share the proceeds of the ticket he "scratched."[3] Such consideration does not derive from one man having bested the other in a game of chance. Nor does it derive from any sort of loan.

Therefore, the agreement that forms the basis of Pearsall's cause of action is not a gaming contract as defined in § 16–1701, and the trial court erred in applying the statute in this case.[4]

### B.

In addition to concluding that the Pearsall–Alexander agreement does not offend the letter of § 16–1701, we are equally convinced that it gives no offense to the statute's spirit. The public policy behind § 16–1701, and similar statutes, is to deny use of judicial process to those who would undermine laws meant to prevent gambling by using the courts to collect on gambling

debts. *See, e.g., Kaszuba v. Zientara,* 506 N.E.2d 1, 2 (Ind.1987); *Castilleja v. Camero,* 414 S.W.2d 424, 427 (Tex.1967). That policy cannot be vindicated here, where the gambling involved, betting on the D.C. Lottery, is legal under the laws of this jurisdiction, pursuant to D.C.Code § 2–2501 to 2537, and is encouraged by the authorities responsible for promoting such gambling in the jurisdiction.

Stated differently, denying Pearsall recovery is not going to discourage illegal gambling in this instance, because the gambling involved, betting on the D.C. Lottery, is not illegal. Nor does it make sense to say that denying Pearsall recovery will serve the public policy interest of discouraging gambling in general, whether legal or illegal, when the District is spending money to encourage people like Pearsall and Alexander to gamble on the Lottery in order to serve the public policy behind the Lottery.

We note that other jurisdictions faced with public policy challenges to agreements to share the proceeds of winning lottery tickets have reached the same result we reach today. *See, e.g., Kaszuba v. Zien-*

chines, which were legal in the county where the loan was made. In invalidating this contract, the court applied Maryland's Statute of Anne, which, like our own, expressly voids such contracts.

Similarly, we distinguish this case from the Nevada cases cited by the *Hamilton* court, which held that the Statute of Anne remained in force despite the legality of gambling in Nevada. Like *Hamilton,* those cases dealt with the types of contracts expressly invalidated by the Statute of Anne, and thus it was held that the Statute prevented a gambling establishment from suing a customer to recover losses, *West Indies, Inc. v. First Nat'l Bank of Nev.,* 67 Nev. 13, 214 P.2d 144 (1950), a customer from suing a gambling establishment to recover winnings, *Weisbrod v. Fremont Hotel, Inc.,* 74 Nev. 227, 326 P.2d 1104 (1958), and a creditor from recovering funds loaned to another for the purpose of gambling, *Wolpert v. Knight,* 74 Nev. 322, 330 P.2d 1023 (1958). Once again, the Pearsall–Alexander agreement does not fall into any of these categories and, thus, these cases are inapposite.

3. The issue of consideration is discussed in greater detail *infra* pp. 117–118.

4. Because we conclude that the trial court misapplied the statute in this case, we do not reach

the issue of whether the statute has been repealed or narrowed by the passage of D.C.Code § 2–2501 to 2537 (1988) creating the D.C. Lottery. However, we do note with interest § 2–2520, which is titled "Persons ineligible to purchase tickets or *shares* or receive prizes." (Emphasis added). This reference to shares seems to acknowledge that agreements to share winnings exist. The section then goes on to forbid Board employees or members of their households from sharing prizes, which has the effect of preventing those forbidden from directly purchasing tickets from doing so indirectly. Significantly, the section limits its ban on shares to Board employees and members of their households, and does not extend the ban generally to those, like Pearsall and Alexander, who are permitted to purchase tickets.

The reference to shares in § 2–2520 also persuades us to reject Alexander's argument that the rules of the D.C. Lottery, as set forth in 29 D.C.Reg. § 603 at 2202 (1982), *Ownership of Lottery Tickets* and which deem the person who holds or signs the back of the ticket as the ticket owner, preclude agreements to share winnings. It is clear to us that these rules apply to the relationship between the Lottery Commission and claimants, and do not speak to agreements between claimants and third parties.

*tara, supra,* 506 N.E.2d at 1; *Miller v. Radikopf,* 394 Mich. 83, 228 N.W.2d 386 (1975); *Castilleja v. Camero supra,* 414 S.W.2d 424. Although these decisions concerned actions brought in jurisdictions where lotteries were illegal by residents of those jurisdictions seeking to recover a share of the proceeds from winning tickets purchased in jurisdictions where lotteries were legal, and therefore turned on conflict-of-law analyses, the public policy concerns at stake were similar to those before us in this case. Thus, we find persuasive the reasoning set forth by the Supreme Court of Indiana in *Kaszuba v. Zientara, supra,* 506 N.E.2d at 2–3, in which the court said:

> [t]here is no benefit to the citizens of this State in prohibiting an agreement of this nature. It will not shelter them from lotteries conducted in sister states. It will not deter people from purchasing lottery tickets in Illinois, Ohio or Michigan. Finding the agreement between Zientara and Kaszuba illegal and unenforceable as against public policy, rather than being of benefit to Indiana residents, would instead reward people who convert the property of others to their own use.

We further note that the force of this reasoning is only increased where, as in this situation, the gambling at issue is legal in the court's own jurisdiction. If a jurisdiction surrounded by states with legalized lotteries cannot expect to deter its citizens from betting on such lotteries by prohibiting agreements of this kind, then surely a jurisdiction with its own legalized lottery cannot expect, and more to the point should not be about the business of trying, to deter its citizens from betting on its own lottery by prohibiting such agreements either.

News accounts and personal observations reveal that it is common practice for friends, relatives, and coworkers to pool their resources and purchase large blocks of tickets on those occasions when various state lotteries present exceptionally large prizes. The approach taken by the trial court would make such arrangements perilous indeed, by permitting the unscrupulous holders of winning tickets to renege on their agreement and keep the winnings for themselves. We agree with the Supreme Court of Indiana that such an approach would only reward those who convert the property of others, without conferring any benefit on the citizens of the District.

### III.

■ The record supports the trial court's finding that an agreement existed between Pearsall and Alexander to share equally in the proceeds of the winning ticket at issue.

The conduct of the two men on the evening of December 16, 1982, when the ticket was purchased, clearly demonstrates a meeting of the minds. After purchasing the first pair of tickets, Pearsall asked Alexander if he was "in on it." Not only did Alexander give his verbal assent, but later, when the two reached Alexander's home, Alexander, who had contributed nothing to the purchase price of the tickets, snatched *both* tickets from Pearsall and anxiously "scratched" them. It is evident from this that Alexander considered himself "in on" an agreement to share in the fortunes of the tickets purchased by his friend. It is equally clear that in giving over tickets he had purchased, Pearsall gave his assent to the agreement he had proposed earlier in the car. Moreover, this conduct took place within the context of a long-standing pattern of similar conduct, analogous to a "course of conduct" as described in the Uniform Commercial Code,[5] which included their practice of "plowing back" small returns from winning tickets into the purchase of additional tickets.[6]

---

5. U.C.C. § 1–205(1), adopted in the District of Columbia as D.C.Code § 28:1–205(1) (1981), provides that "[a] course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct."

6. In view of this evidence, we reject Alexander's contention that the trial court's finding of an agreement between the two men was clearly erroneous or not supported by sufficient evi-

■ It is also clear to us that, by exchanging mutual promises to share in the proceeds of winning tickets, adequate consideration was given by both parties. An exchange of promises is consideration, so long as it is bargained-for. RESTATEMENT (SECOND) CONTRACTS, § 75 (1932). Moreover, consideration may consist of detriment to the promisee. *Clay v. Chesapeake & Potomac Tel. Co.*, 87 U.S.App.D.C., 284 F.8d 995 (1950). The giving over of one-half of the proceeds of a winning ticket would be a detriment to either man. Therefore, Pearsall's promise to share, as expressed in his question to Alexander, "Are you in it?" induced a detriment in Alexander. Likewise, Alexander's promise to share, as contained in his assent, induced a detriment in Pearsall.[7]

■ Finally, we find no merit in Alexander's contention that the agreement is unenforceable under D.C.Code § 28:1–206, because it is not in writing. § 28:1–206 provides as follows:

**Statute of Frauds for kinds of personal property not otherwise covered.**

(1) Except in the cases described in subsection (2) of this section a contract for the sale of personal property is not enforceable by way of action or defense beyond five thousand dollars in amount or value of remedy unless there is some writing which indicates that a contract for sale has been made between the parties at a defined or stated price, reasonably identifies the subject matter, and is signed by the party against whom enforcement is sought or by his authorized agent.

(2) Subsection (1) of this section does not apply to contracts for the sale of goods (section 28:2–201) nor of securities (section 28:8–319) nor to security agreements (section 28:9–203).

D.C.Code § 28:1–206 (1981).[8]

This statute, which applies only to the sale of personal property "beyond" $5000, is inapplicable on its face. The Pearsall–Alexander agreement does not involve the sale of personal property. There was no agreement between the parties for the holder of a winning ticket to "sell" half of his winnings, as personal property, to the other. This was simply an agreement to share the proceeds of a jointly-purchased ticket; no buying or selling as between the parties was contemplated or required.

## IV.

In conclusion, we find that there was a valid, enforceable agreement between Pearsall and Alexander to share in the proceeds of the $20,000 ticket purchased by Alexander on the evening of December 16, 1982. Therefore, we reverse and remand with instructions to enter judgment in favor of the appellant.

*Reversed and remanded.*[9]

---

dence. Furthermore, we see no reason to disturb the trial court's findings on credibility.

7. Adequate consideration also may be found by characterizing this agreement as an exchange of mutual promises to forbear. WILLISTON ON CONTRACTS, THIRD EDITION § 135 at 567 (1957). Forbearance may be found in each party's promise not to exercise his right to keep to himself the entirety of the proceeds of a winning ticket in his possession.

8. The other sections of this statute have no application here either.

9. We find no merit in Alexander's argument that we should refuse to enforce the contract because Pearsall allegedly intended to defraud the Internal Revenue Service by permitting Alexander, who allegedly was in a lower tax bracket than Pearsall, to claim the prize. At this point, such allegations are merely speculative and, therefore, are not properly before this court. If any tax fraud were to occur, we are confident that the Internal Revenue Service would take appropriate enforcement action.