259 N.J. Super. 523 (1992)
614 A.2d 634
ANTHONY LOMONACO, PLAINTIFF,
v.
SANDS HOTEL CASINO AND COUNTRY CLUB AND BALLY'S PARK PLACE AND THE CLARIDGE AT PARK PLACE, INC., DEFENDANTS.
Superior Court of New Jersey, Law Division Gloucester County.
February 7, 1992.
*524 Fred Lowenschuss, for plaintiff.
Frederick H. Kraus, for defendant Sands Hotel Casino and Country Club.
James D. Toll, for defendant Bally's Park Place (Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross, attorneys).
Brian D. Spector, for defendant The Claridge at Park Place, Inc. (Ribis, Graham & Curtin, attorneys).
HOLSTON, J.S.C.
Plaintiff, by way of declaratory judgment action, seeks to have $285,000.00 in casino markers[1] which were signed by him, declared void as having been obtained by duress or as unconscionable and therefore against public policy. The defendants move for summary judgment against plaintiff, asserting that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law. This motion raises issues of first impression in this State. Plaintiff asserts that defendants acted in such a manner and exhibited such psychological pressure as to induce plaintiff to incur debt in the form of casino markers by compulsion sufficient to overcome his free will. The issue to be decided by this court is whether the common law defenses of duress and unconscionability are available to render void or voidable the financial debt evidenced by the signing of casino markers.
The facts presented in the light most favorable to plaintiff are as follows. On January 19, 1990, plaintiff began a "marathon" gambling session at the Claridge Casino. After a few *525 hours, plaintiff told a casino employee that he was not feeling well and was given some pain reliever. Plaintiff continued to play until he stopped to eat dinner. During his dinner, a casino employee approached plaintiff and stated that he had arranged for plaintiff to stay in a suite in the hotel for the entire weekend. Plaintiff declined, quickly finished his dinner, and returned to the casino to play blackjack. He continued playing until the casino closed at 6:00 a.m. By that time, plaintiff had lost $5,000.00 in cash and had signed $45,000.00 in markers. At that time, plaintiff went to the suite and remained there until 10:00 a.m., when the casino reopened.
When plaintiff returned to the casino, he recounted the evening's activities to the pit boss, and told the pit boss that he was hoping to recoup his losses. Plaintiff continued to play blackjack until 3:00 p.m., at which time he had lost a total of $105,000.00.
At 3:00 p.m., plaintiff went to the Sands Hotel and Casino. Plaintiff went to the "special" blackjack tables in the baccarat pit and was greeted by several casino employees who knew plaintiff. When they asked plaintiff how he was, he told them that he had been gambling non-stop since the night before and had lost $105,000.00. In less than one hour at the Sands, plaintiff had signed markers for an additional $50,000.00.
Plaintiff states that during the time he was in the Claridge and the Sands, he became very abusive, cursed, accused the dealers of cheating him, threw cards, smashed an ashtray and "made a spectacle" of himself. After the casino changed dealers and plaintiff lost more money, he demanded that the dealer be replaced with a new dealer. When the Sands refused to replace the dealer, plaintiff left in a condition which plaintiff describes as "livid ..., obscene, loud, and totally out of control." At that point, plaintiff left the Sands and went across the street to Bally's Park Place.
At Bally's, plaintiff was again greeted by casino employees who asked how he was. Plaintiff responded by telling the *526 employees that he was in a "dead heat," that he had been playing continuously since the day before, and that he had lost $105,000.00 at the Claridge and $50,000.00 at the Sands. At that point, Bally's gave him chips and a private table with a minimum bet of $500.00. In minutes, plaintiff lost $10,000.00. Casino employees continued to give him chips and plaintiff continued to sign markers. Plaintiff stated that he also believes that Bally's employees had him sign papers to increase his credit limit beyond what plaintiff had requested. Plaintiff continued with the same abusive, erratic behavior as before, and continued gambling at Bally's, and then back at the Sands, until after midnight.
The crux of plaintiff's argument is that plaintiff, through his words and actions, specifically advised casino employees that he was a compulsive gambler. Additionally, defendants had information readily available to them that Caesar's Hotel and Casino had cancelled plaintiff's line of credit at Caesar's because plaintiff had been identified as a compulsive gambler.[2]
Plaintiff asserts, and defendants agree that a violation of the credit provisions of the Casino Control Act, N.J.S.A. 5:12-101(b), would render an extension of credit unenforceable. Plaintiff further argues, however, that the circumstances surrounding plaintiff's request of credit contracts represented by the markers is entitled to be voided based on the common law contractual defenses of duress and unconscionability because the contracts were so overreaching that no one not under duress would accept their terms. As the Supreme court noted:
[T]he Casino Control Act was enacted by the legislature in 1977 (L. 1977, c. 110, N.J.S.A. 5:12-1 to 152) to authorize casino gaming and establish the regulatory framework for the casino industry. The Statutory and administrative controls over casino operations established by the Act are extraordinarily pervasive and intensive.... Over 11 statutory articles and almost 200 separate provisions *527 cover virtually every facet of casino gambling and its potential impact upon the public. The regulatory scheme is both comprehensive and minutely elaborate. [Knight v. Margate, 86 N.J. 374, 380-81, 431 A.2d 833 (1981).]
Under N.J.S.A. 5:12-72, the Casino Control Commission is charged with carrying on:
a continuous study of the operation and administration of casino control laws which may be in effect in other jurisdictions, literature on this subject which may from time to time become available, federal laws which may affect the operation of casino gaming in this State, and the reaction of New Jersey citizens to existing and potential features of casino gaming under this act. It shall be responsible for ascertaining any defects in this act or in the rules and regulations issued thereunder, formulating recommendations or changes in this act to prevent abuses thereof, guarding against the use of this act as a cloak for the carrying on of illegal gambling or other criminal activities, and insuring that this act and the rules and regulations shall be in such form and be so administered as to serve the true purposes of this act.
[N.J.S.A. 5:12-72]
Defendants in their briefs and in their arguments provided a lengthy history of the regulations concerning casinos' issuance of markers which defendants allege demonstrates a legislative intent as striking a balance between the economic need of the casinos to grant credit and the public desire to avoid over extension of credit to some patrons. Defendants assert that the only remedy for a patron occurs when credit is extended in violation of N.J.S.A. 5:12-10(b). Defendants therefore suggest that for the judiciary or this court to permit a compulsive gambling defense would improperly cause the judiciary to usurp the commission's oversight responsibility and violate the separation of powers doctrine. See N.J. Const. (1947), Art. III, ¶ 1, which states in pertinent part: "No person or persons belonging to or constituting one branch [of government] shall exercise any of the powers properly belonging to either of the others...." See also U.S. Const., Art. III.
Defendants argue that section 101(b) of the Casino Control Act, N.J.S.A. 5:12-101(b), provides the precise steps that must be taken in order to accept a check from any person to enable that person to take part in gaming. N.J.S.A. 5:12-101(b) provides, in pertinent part:

*528 No casino licensee ... may accept a check ... from any person to enable such person to take part in gaming activity as a player ... unless:
(1) The check is made payable to the casino licensee;
(2) The check is dated, but not postdated;
(3) The check is presented to the cashier or his representative and is exchanged only for a credit slip or slips which total an amount equal to the amount for which the check is drawn, which slip or slips may be presented for chips at a gaming table; and
(4) The regulations concerning check cashing procedures are observed by the casino licensee and its employees and agents.[3]
[N.J.S.A. 5:12-101(b)]
Thus, defendants allege that this court, by permitting plaintiff's allegations to survive would be creating judicially a new and previously unrecognized defense of compulsive gambling to void casino markers properly granted in accordance with the above statutory scheme. In support of this position, defendants cite Miller v. Zoby, 250 N.J. Super. 568, 595 A.2d 1104 (App.Div. 1991). In that opinion, the court stated that "[a] review of the `declaration of policy of legislative findings' ... engender [sic] the conclusion that the Legislature intended that the casino industry be strictly `regulated and controlled ... *529 pursuant to the provisions of this act,' N.J.S.A. 5:12-1, subd. b(13), and not by a creatively-spirited judiciary." Id. at 579, 595 A.2d 1104.
Defendants argue that the facts in Miller are similar to those in the instant case. In Miller, Miller wrote personal and business checks to Zoby, a casino junket operator, who loaned him cash to be used for gambling as part of junkets to the Sands Casino. Zoby deposited all of these checks in his personal account. Plaintiffs, who were co-executors of Miller's estate, contended that Zoby had advanced these sums to Miller against his casino credit account in violation of N.J.S.A. 5:12-101, and brought suit against Zoby to recover Miller's $267,000 in gambling losses. The court ruled that plaintiffs could not collect from defendants because N.J.S.A. 5:12-101 did not create an implied private right of action in favor of plaintiffs. The Miller case is distinguishable from the facts present here. Contrary to defendants' assertions, the plaintiff here does not seek to create a remedy under this statute. Plaintiff seeks to declare unenforceable and void the contracts evidenced by the markers signed by him based on what he contends are the existence of plaintiff's inability to form the free will to contract as a result of duress exercised upon him and the unconscionability of the contracts as made. Therefore, the central issue is whether the statutory scheme abrogates the common law contract defenses of duress and unconscionability.
It is a settled principle of our law that statutes in derogation of the common law are to be construed narrowly. State of New Jersey v. Western Union Telegraph Co., 12 N.J. 468, 486, 97 A.2d 480 (1953); Oswin v. Shaw, 129 N.J. 290, 609 A.2d 415 (1992). Doubt about the meaning of such statutes should be resolved in favor of
[t]he effect which makes the least rather than the most change in the common law. The rule has been declared by the United States Supreme Court as follows: "`[N]o statute is to be construed as altering the common law, farther than its words import. It is not to be construed as making any innovation upon the common law which it does not fairly express.'"

*530 [Oswin v. Shaw, [129] N.J. at [310, 609 A.2d 415] (1992) (slip op. at 25-26), citing 3 Norman J. Singer, Sutherland Statutory Construction § 61.01, at 77 (4th ed. 1986) (footnote omitted) (quoting Shaw v. Railroad Co., 101 U.S. 557, 565, 25 L.Ed. 892, 894 (1880)).]
There is no section of the Casino Control Act which states that the defense of duress, the elements of which plaintiff alleges would be present here if plaintiff suffered from the illness of compulsive gambling, may not be asserted to void a contract in the form of casino markers. Thus, this court must find that under principles of strict construction, the common law contract defenses of incapacity, duress, and unconscionability still exist.[4] This court must assume that if the Legislature intended to do away with the defenses to the validity of a contract in the casino context, it would have incorporated such an intent into the statute.
Thus, this court cannot adopt the inferences suggested by defendants that N.J.S.A. 5:12-101, which regulates the procedure to be utilized by casinos in accepting counter checks, provides the exclusive remedy to void or make voidable the debt evidenced by the casino counter checks. This statute speaks only to the procedure for accepting such credit and does not speak to when such credit may or may not be issued. As such, this court cannot now find that it was the Legislature's intent to abolish all defenses to such contracts for casino credit even under circumstances in which the casino issued credit to a patron who the casino clearly knows cannot form freely the intent to enter into such a contract, or if the casino knows or should know the patron does not have the financial means to perform on such a contract.
Having found that N.J.S.A. 5:12-101 does not abrogate the common law defenses to contract actions, this court must now decide whether there are genuine issues of material fact which *531 would allow plaintiff to validly assert the defenses of unconscionability or duress. Judson v. People's Bank & Trust Co. of Westfield, 17 N.J. 67, 110 A.2d 24 (1954).
The Appellate Division noted that "[o]ur Supreme Court has recognized that when there has been moral compulsion sufficient to overcome the will of a person otherwise competent to contract, any agreement made under the circumstances is considered to be lacking in voluntary consent and therefore invalid.... Thus, the legal concept of duress is based upon the `unreality of the apparent consent of a contracting party.'" Shanley & Fisher v. Sisselman, 215 N.J. Super. 200, 209, 521 A.2d 872 (App.Div. 1987) citing Rubenstein v. Rubenstein, 20 N.J. 359, 365-66, 120 A.2d 11 (1956). The test for determining whether such a "moral compulsion exists is whether the duress is of such severity as to overcome the will of a person of ordinary firmness." Shanley & Fisher, 215 N.J. Super. at 212-13, 521 A.2d 872 (citation omitted).
The standard for successfully pleading the defense of unconscionability has been set forth by the Appellate Division in Howard v. Diolosa, 241 N.J. Super. 222, 574 A.2d 995 (App.Div. 1990). In that case, the court stated that "[a] contract is unenforceable if its terms are manifestly unfair or oppressive and are dictated by a dominant party." Id. at 230, 574 A.2d 995, citing Kuzmiak v. Brookchester, 33 N.J. Super. 575, 111 A.2d 425 (App.Div. 1955). To prove unconscionability, the plaintiff must demonstrate "... some overreaching or imposition resulting from a bargaining disparity between the parties, or such patent unfairness in the contract that no reasonable person not acting under compulsion or out of necessity would accept its terms." Howard, 241 N.J. Super. at 230, 574 A.2d 995, citing Rotwein v. General Accident Group & Cas. Co., 103 N.J. Super. 406, 417-18, 247 A.2d 370 (Law Div. 1968) (Handler, J.).
In considering these definitions of duress and unconscionability as well as the facts as presented in the light most *532 favorable to the plaintiff, this court holds that there are genuine issues of material fact which, if presented as evidence at trial, may allow a finder of fact to conclude that the circumstances surrounding plaintiff's entering in to the contracts for credit were such as to render the contracts void or voidable due to duress or unconscionability.
In so holding, this court specifically and narrowly holds that, under the facts as alleged in this case, the circumstances of plaintiff's bizarre behavior causing his compulsive gambling and signing of casino markers may be such that the contracts may be void due to a lack of free will on the part of the plaintiff to have entered into such contracts due to duress or unconscionability. This court in so holding finds no support in legislation or case law that the disorder of compulsive gambling should, in and of itself, be recognized as a defense to capacity to contract which will render a contract void.
NOTES
[1] As Defendant Sands points out, "markers" is a slang term for counter checks that are defined at N.J.A.C. 19:45-1.25(j).
[2] It is important to note that Caesar's Hotel and Casino is not a party to this action. However, it is undisputed that information about Caesar's cancelling of plaintiff's credit line was readily available to the defendants in this case.
[3] It should be noted, that the Legislature has recently amended section 101 adding the provision:

A person may request the commission to put that person's name on a list of persons to whom the extension of credit by a casino as provided in this section would be prohibited by submitting to the commission the person's name, address, and date of birth. The person does not need to provide a reason for this request. The commission shall provide this list to the credit department of each casino; neither the commission nor the credit department of a casino shall divulge the names on this list to any person or entity other than those provided for in this subsection. If such a person wishes to have that person's name removed from the list, the person shall submit this request to the commission, which shall so inform the credit departments of casinos no later than three days after the submission of the request.
N.J.S.A. 5:12-101(j), amended by L. 1991, c. 182, § 39, eff. June 29, 1991. Such a provision clearly strengthens the Casino Control Commission's power to oversee the extension of credit to individuals who perceive that they are compulsive gamblers. It does not, however, create any remedies for voiding markers to individuals who are compulsive gamblers. This provision was not in effect on January 19, 1990.
[4] The court is not convinced that the factual elements necessary to sustain the common law defense of incapacity have been raised here and accordingly grants summary judgment as to that defense. Judson v. Peoples Bank and Trust Co. of Westfield, 17 N.J. 67, 110 A.2d 24 (1954).