Walter SEIGEL, Appellant,

v.

**MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., Appellee.**

No. 98–CV–1159.

District of Columbia Court of Appeals.

Argued Sept. 8, 1999.
Decided Feb. 3, 2000.

Robert N. Levin, Bethesda, MD, for appellant.

Jeffrey P. Bloom, Washington, DC, for appellee.

Before WAGNER, Chief Judge, STEADMAN, Associate Judge, and NEWMAN, Senior Judge.

STEADMAN, Associate Judge:

Two New Jersey casinos cashed checks totaling $143,000 drawn by plaintiff Walter Seigel, one of its patrons, on his cash management account at defendant Merrill Lynch, Pierce, Fenner, & Smith, Inc. ("Merrill Lynch"). On returning home to Maryland, Seigel placed a stop payment order on the checks, but Merrill Lynch nonetheless paid them by mistake. Seigel then brought this suit against Merrill Lynch seeking to recover the amount of the checks. The trial court granted summary judgment for Merrill Lynch.

Among other issues, Seigel on appeal invokes a "compulsive gambler" defense under New Jersey law, arguing that the checks were unenforceable where made. Alternatively, he claims that the District's version of the Statute of Anne, D.C.Code § 16–1701, which voids certain gambling debts, establishes that the checks were unenforceable in this jurisdiction. Merrill Lynch refers us to the provisions of the Uniform Commercial Code dealing with stop payment orders, D.C.Code §§ 28:4–403, 407 as determinative of the dispute here. We agree with Merrill Lynch's approach and affirm the summary judgment in its favor.

I.

The events giving rise to this lawsuit arose in January and February of 1997 and have been stipulated to as follows. During that time period, plaintiff/appellant Seigel, a Maryland resident, traveled to Atlantic City, New Jersey to gamble. While there, he wrote a number of checks to various casinos, and, in exchange, received gambling chips with which to wager. The checks were drawn on Seigel's cash management account with defendant/appellee, which was established through Merrill Lynch's District of Colum-

bia offices. There were sufficient funds in the account to cover all the checks.

Seigel eventually gambled away all of the chips he had received for the checks. Upon returning to Maryland, Seigel discussed the status of the outstanding checks with Merrill Lynch, informing his broker of the gambling nature of the transactions, and his desire to avoid realizing the apparent losses. Merrill Lynch informed Seigel that it was possible to escape paying the checks by placing a stop payment order and liquidating his cash management account. Seigel took this advice and instructed Merrill Lynch to close his account, liquidate the assets, and not to honor any checks drawn on the account. Merrill Lynch agreed, and confirmed Seigel's instructions.

Many of the checks were subsequently dishonored, and are not now at issue. However, Merrill Lynch accidently paid several of the checks totaling $143,000, despite the stop payment order and account closure. Merrill Lynch then debited Seigel's margin account to cover the payments.

Seigel brought suit in the District of Columbia against Merrill Lynch, alleging breach of contract, negligence, and breach of trust, demanding a return of the $143,-000 plus interest. After filing a joint statement of stipulated facts, Seigel filed a motion for summary judgment, along with an attached affidavit. He argued that D.C.Code § 16–1701 precluded enforcement of the checks as a void gambling debt, or in the alternative that New Jersey law prohibited the enforcement of the checks, and that therefore Merrill Lynch had no rights by way of subrogation as a defense to its payment over the stop payment order. Merrill Lynch made a cross-motion for summary judgment, denying the applicability of the D.C. statute or any relevant New Jersey law. It contended that it stood in the shoes of the casinos to whom valid and enforceable checks were

given, and therefore the plaintiff had not suffered any actual loss as a result of the payment of the checks. On June 24, 1998, the trial court issued an order granting defendant's motion, and dismissing the complaint. This appeal followed

 We apply here the familiar standard for review of grants of summary judgment. Summary judgment is only appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Fuller v. Chemical Specialties Mfg. Corp.,* 702 A.2d 1239, 1241 (D.C.1997). Review of a grant of summary judgment is de novo. *Zhou v. Jennifer Mall Restaurant, Inc. .,* 699 A.2d 348, 350 (D.C.1997). On appeal, the reviewing court must view the record in the light most favorable to the non-movant, and any doubt as to the existence of a factual dispute must be resolved against the movant. *Fuller, supra,* 702 A.2d at 1240. However, "[m]ere conclusory allegations on the part of the non-moving party are insufficient to stave off the entry of summary judgment." *D'Ambrosio v. Colonnade Council of Unit Owners,* 717 A.2d 356, 358 (D.C.1998) (quoting *Musa v. Continental Ins. Co.,* 644 A.2d 999, 1001–02 (D.C.1994)). Furthermore, once the movant has made a prima facie showing, the opposing party, to prevail, must rebut with specific evidence. *Wood v. Barwood Cab Co.,* 648 A.2d 670, 671 n. 5 (D.C.1994) (citing *Wyman v. Roesner,* 439 A.2d 516 (D.C.1981)).

## II.

We begin with an examination of the statutory scheme relating to stop payment orders, because we believe these provisions are determinative of this appeal. The relevant sections are found in the Uniform Commercial Code as enacted in the District of Columbia, and in particular D.C.Code §§ 28:4–403 and 28:4–407 (1996 Repl.).[1]

---

1. These sections by their terms apply only to banks. However, by stipulation, the parties

describe the negotiable instruments drawn by Seigel as "checks," which are by definition

The basic right of the depositor to stop payment on any item drawn on the depositor's account is set forth in section 28:4–403(a). However, liability on the bank for payment over a stop payment order is far from automatic. On the contrary, section 28:4–403(c) provides: "The burden of establishing the fact and amount of loss resulting from the payment of an item contrary to a stop-payment order or order to close an account is on the customer."

This provision, which places the burden on the customer to show actual loss, is reinforced by the extensive rights of subrogation given to the payor bank by section 28:4–407. Under that section, as to the drawer or maker (that is, the depositor), the bank is subrogated both to the rights of "any holder in due course on the item" and to the rights of "the payee or any other holder of the item against the drawer or maker either on the item or under the transaction out of which the item arose."[2] As a leading authority on the Uniform Commercial Code has noted, this section "contemplates that the bank will use its subrogation rights primarily to defend against a suit by the customer to recover payment." 2 WHITE & SUMMERS, UNIFORM COMMERCIAL CODE § 21–6, at 396 n. 11 (4th ed.1995) [hereinafter WHITE & SUMMERS].

◼ As applied to the facts here, then, Seigel is required to bear the burden of establishing that he in fact suffered a loss as a result of the payment of the checks. In assessing whether any such loss was actually incurred, Merrill Lynch must be treated as the subrogee of any rights of the casino payees against Seigel. As the payee of a dishonored check, the casino would have a prima facie right to recover its amount from Seigel as drawer, D.C.Code § 28:3–414(b), and the burden would be on Seigel to establish any defense he might assert on the instrument. D.C.Code § 28:3–308(b); *Nation–Wide Check Corp. v. Banks*, 260 A.2d 367, 370 (D.C.App.1969). Seigel asserts two such defenses: duress and illegality. We turn to an examination of those defenses.[3]

## III.

### A.

◼ Seigel first argues that the casinos would have no right to enforce the checks even under New Jersey law because he is a compulsive gambler. He contends that enforcement of checks by a casino against a compulsive gambler would run counter to New Jersey's Casino Control Act, or against the common law, and therefore the checks are invalid. N.J.S.A. § 5:12–1 *et seq.* (1998). Nothing in the New Jersey Casino Control Act, however, specifically prohibits the cashing and redemption of checks made by "compulsive gamblers." *See* N.J.S.A. § 5:12–101 (1998) (check cashing and redemption under the Casino Control Act). New Jersey statutes and case law make clear that extending

---

drafts payable on demand and drawn on a bank. D.C.Code § 28:4–104(f). Furthermore, the official comment to section 4–403 in the Uniform Commercial Code takes special note that "[b]y analogy the rule extends to drawees other than banks." Therefore, as do the parties in their briefs, we treat appellee as a bank for purposes of this analysis.

2. The bank is also subrogated to the rights of the "drawer or maker against the payee or any other holder of the item with respect to the transaction out of which the item arose."

3. The trial court took the view that the casinos, and thus Merrill Lynch, had the status of holders in due course under D.C.Code § 28:3–302. Although we need not decide the issue for purposes of this appeal, it appears that neither the casinos nor Merrill Lynch can fall within this category. They held the checks with knowledge of the use for which the checks had been written, and thus were not innocent holders, unaware of the defenses appellant now brings forward under the laws of New Jersey and the District of Columbia, grounded in the gaming purpose of the drafts. D.C.Code § 28:3–302(2). Indeed under § 28:3–305(b) and (a)(1)(ii) even a holder in due course takes a negotiable instrument subject to the so-called real defenses based on "duress, lack of legal capacity, or illegality of the transaction which, under other law, nullifies the obligation of the obligor."

credit to gamblers contrary to emergency orders of the Casino Control Commission creates an unenforceable obligation. *Zarin v. Commissioner*, 916 F.2d 110, 113 n. 7 (3rd Cir.1990). However, there is nothing in the record to suggest that these checks were accepted contrary to a specific order of the Casino Control Commission, and therefore there is no genuine issue of fact on this point.

■ With regard to Seigel's common law argument, it appears to be true that intoxication, duress, and unconscionability may, in certain circumstances, be valid defenses to the enforcement of gambling contracts in New Jersey. *Hakimoglu v. Trump Taj Mahal Assoc.*, 876 F.Supp. 625 (D.N.J.1994), *aff'd* 70 F.3d 291 (3rd Cir. 1995). *Accord, Lomonaco v. Sands Hotel Casino*, 259 N.J.Super. 523, 614 A.2d 634 (Law Div.1992). However, compulsive gambling, in and of itself, is not a defense to a contract action in New Jersey. *Lomonaco, supra*, 614 A.2d at 638. Rather, the facts of a particular transaction may reveal "some overreaching or imposition resulting from a bargaining disparity between the parties, or such patent unfairness in the contract that no reasonable person not acting under compulsion or out of necessity would accept its terms." *Id.* (holding that there existed a genuine issue of material fact regarding the validity of a counter check made by a gambler, shown in the record to have acted in an extreme and outrageous manner) (quoting *Howard v. Diolosa*, 241 N.J.Super. 222, 574 A.2d 995, 999 (App.Div.1990)). The question, therefore, is whether Seigel has set forth adequate facts to raise a genuine issue regarding the enforceability of the checks in light of his alleged compulsion and duress flowing from that disorder.

■ The entirety of appellant's duress argument emanates from a single sentence in his affidavit: "For years I have had [a] gambling problem." Affidavit of Plaintiff Walter Seigel, ¶ 1. If not ambiguous, the statement is conclusory. Unlike the gambler in *Lomonaco*, appellant fails to produce any evidence in the record, specific or otherwise, regarding his problem and its relation to any unconscionable duress in the transactions at issue. 614 A.2d at 635–36, 638 (describing an abusive and bizarre "marathon gambling session," that included unsolicited credit increases from the casino, the existence of an alleged psychological disorder and defendant's concomitant use of pain killers, during which the defendant lost $285,000 in little over two days). The record—even when viewed in the light most favorable to Seigel on whom the burden of proof rests—simply does not present a genuine disputed issue of fact as to whether the contracts evidenced by the checks were made under duress, and therefore unenforceable. *D'Ambrosio, supra*, 717 A.2d at 358 (conclusory allegations inadequate to rebut summary judgment); *Wood, supra*, 648 A.2d at 671 n. 5 (specific facts necessary to rebut prima facie case). We therefore conclude that Seigel's assertion that the checks would be unenforceable in New Jersey fails.

### B.

Seigel also invokes the fact that these checks were given in order to obtain chips with which to gamble, and cites us in particular to D.C.Code § 16–1701(a) (1997 Repl.). Modeled after the English "Statute of Anne," 9 Anne, 14, § 1 (1710), that section provides that:

> A thing in action, judgment, mortgage, or other security or conveyance made and executed by a person in which any part of the consideration is for money or other valuable things won by playing at any game whatsoever, or by betting on the sides or hands of persons who play, or for the reimbursement or payment of any money knowingly lent or advanced for the purpose, or lent or advanced at the time and place of the play or bet, to a person so playing or betting or who, during the play, so plays or bets, is void.

In substance, Seigel claims that this statute would serve as a defense if the casinos

were to seek to enforce the checks in the first instance in a District of Columbia court,[4] and therefore this same statute requires that he be entitled to affirmatively recover from Merrill Lynch the amount of the checks in a District of Columbia court, regardless of the checks' enforceability elsewhere.

■ We may assume for present purposes that this statute would prevent direct enforcement of the checks in the District of Columbia,[5] a somewhat dubious proposition in itself given the validity of the checks where made.[6] But that is not this case. Rather, the question is whether under the relevant provisions of the Uniform Commercial Code, Seigel has met his burden of proof to establish actual loss. We think he has not.

As already indicated, even if payment had been stopped, the casinos could have enforced the checks in New Jersey, where the transaction was entered into. Merrill Lynch therefore, under the Code scheme, conceptually has the same right. Furthermore, even if there were a problem in asserting jurisdiction over Seigel in New Jersey, Maryland would have provided an

appropriate forum for enforcing the checks. The highest Maryland court has squarely held that because there is no longer a strong public policy against gambling per se, but only against illegal gambling, the doctrine of *lex loci contractus* prevails in full, and that therefore Maryland courts will enforce gambling debts if legally incurred in a foreign jurisdiction. *Kramer v. Bally's Park Place, Inc.*, 311 Md. 387, 535 A.2d 466, 471 (1988). Accordingly the casinos, and hence derivatively Merrill Lynch, could enforce the checks directly against Seigel in the state of his residence—Maryland.

Seigel suggests that in actual fact, the casinos might not have sought to enforce the checks in either New Jersey or Maryland if they had been properly dishonored by Merrill Lynch. We agree with White and Summers that the relevant Code sections are not susceptible to such a speculative limitation. "Although the customer's argument [that the initial holder would not have brought suit to enforce the obligation] has considerable appeal, we find no place for it in 4–407. Rather 4–407 flatly grants the bank the right to assert the

4. Had the casinos first brought suit in New Jersey, jurisdiction would appear to lie over Seigel under New Jersey's long-arm statute. *See Jacobs v. Walt Disney World, Co.*, 309 N.J.Super. 443, 707 A.2d 477, 481 (App.Div. 1998); N.J. Court Rules, 1969·R. 4:4–4(b)(1). A judgment in a foreign jurisdiction is deemed enforceable in the District, with limited exceptions. D.C.Code §§ 15–382, –383 (1999 Supp.). Although § 15–383(b)(3) excepts from the rules of comity those foreign judgments contrary to the public policy of the District, the allowance is exceedingly narrow. For example, in one of the few cases on point, *Butler v. Butler*, 239 A.2d 616 (D.C.1968), the court refused to validate a Mexican divorce as contrary to public policy, but grounded its reasoning in the foreign court's lack of personal jurisdiction over the defendant—a defect now set apart as a distinct ground for non-enforcement. *See* D.C.Code § 15–383(a)(2). No cases are on record invalidating a foreign judgment under § 15–383(b)(3).

5. With regard to appellant's defense based on illegality under District law, both the trial court and appellee probably overstate the law

when arguing that § 16–1701(c), which provides that "this section does not affect the validity of negotiable instruments embraced by subtitle 1 of Title 28," entirely excludes negotiable instruments from the operation of the provision. In *Wirt v. Stubblefield*, 17 App. D.C. 283, 288 (1900), the appellate court interpreted the impact of the then newly enacted Negotiable Instruments Law on the predecessor of 16–1701. The court drew a distinction between declaring an instrument null and void for all purposes (i.e., invalidating it) and declaring an instrument defective by reason of an illegal consideration. Under the new regime, the latter defense survived except as against holders in due course. See note 3, *supra*.

6. Our most recent case interpreting § 16–1701 suggests that the statute is not to be given an expansive interpretation. *Pearsall v.. Alexander*, 572 A.2d 113 (D.C.1990) (agreement to share winnings of lottery ticket not invalided by statute). It is true, however, that a number of jurisdictions have refused to enforce gambling debts even though valid where incurred. *See* 71 A.L.R.3d 178.

payee-seller's action for the price in this circumstance and so to free itself from any liability to the customer." 2 WHITE & SUMMERS § 21–6, at 395.

We conclude that Seigel failed to establish that he ultimately suffered any actual loss as a result of the payment of the checks by Merrill Lynch.[7] Accordingly, the judgment of the trial court must be

*Affirmed.*

---

**7.** Seigel suggests that even if his claim cannot be sustained under the UCC, he nonetheless may have rights under his theories of breach of contract, negligence, and breach of trust. We fail to see any basis on which to conclude that the obligations of Merrill Lynch can rise any higher than those of a bank in the circumstances here.