241 N.J. Super. 222 (1990)
574 A.2d 995
ALVAH VAN ORDEN HOWARD AND LUCY MARINO HOWARD, PLAINTIFFS-RESPONDENTS,
v.
JOSEPH DIOLOSA AND NANUET NATIONAL BANK, DEFENDANTS-APPELLANTS.
NANUET NATIONAL BANK, THIRD-PARTY PLAINTIFF-APPELLANT,
v.
FRANK J. FLACCAVENTO, THIRD-PARTY DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued December 5, 1989.
Decided May 17, 1990.
*224 Before Judges DEIGHAN, R.S. COHEN and BROCHIN.
John Fiorello argued the cause for appellant Joseph Diolosa (Feldman, Feldman, Hoffmann & Fiorello, attorneys, Linda M. Couso on the brief).
Donald L. Berlin argued the cause for appellant Nanuet National Bank (Berlin, Kaplan, Dembling & Burke, attorneys, Colleen M. Ready on the brief).
G. Thomas Breur argued the cause for respondents Alvah Van Orden Howard and Lucy Marino Howard (Breur & Breur, attorneys).
Jamieson, Moore, Peskin & Spicer, attorneys for New Jersey Bankers Association submitted a brief amicus curiae (Dennis *225 R. Casale of counsel and on the brief, Guy F. Clerici on the brief).
No appearance on behalf of respondent Frank J. Flaccavento.
The opinion of the court was delivered by COHEN, R.S., J.A.D.
Plaintiffs Alvah and Lucy Howard deeded their home to defendant Joseph Diolosa for $25,000 and an uncertain leaseback arrangement. Diolosa then mortgaged the property to defendant Nanuet National Bank for $100,000. The Howards sued to set aside the deed and void the mortgage. Diolosa counterclaimed for unpaid rent. Nanuet crossclaimed against Diolosa for indemnification and filed a third-party complaint against Diolosa's attorney for legal malpractice.
After a bench trial, the Chancery Division judge set aside both the deed and mortgage, ordered the Howards to repay Diolosa the balance of the $25,000 he paid them for the house, without interest and less the $675 monthly rent payments they had made, dismissed Nanuet's crossclaim against Diolosa without prejudice, and dismissed the bank's third-party complaint against the lawyer with prejudice. Diolosa and Nanuet both appealed. We permitted New Jersey Bankers Association to file a brief amicus curiae. We modify in part and affirm.
Before us, the judge's significant findings of fact are not disputed. They are, in any event, supported by sufficient credible evidence. The parties differ principally on the legal consequences of what the judge found occurred.
The Howards moved into a house in Oakland, New Jersey, in the 1950's. At the time, it was owned by John Johnson, an older man Howard knew all his life and regarded as a father. Howard went to work as a carpenter for Johnson. Then, after leaving to serve a few years in the Air Force, he returned to Oakland with his Philippine wife Lucy. Howard, a high school graduate, went to work in a local woodworking shop for 13 *226 years and then as a public school custodian, and the Howards lived with Johnson.
In 1965, Johnson transferred the property to the Howards, subject to a life estate and an agreement that the Howards would care for him in the house. In 1975, Johnson died and the property passed free and clear to the Howards, who continued to live there. In 1987, at age 60, Howard retired from his job as a school custodian, because his obesity prevented him from doing the work.
In late 1985, serious financial problems were pressing the Howards. The house was their only asset and they were a year behind in property tax payments. On their dozen credit cards they owed nearly $23,000, requiring unmanageable minimum monthly payments of some $760.[1] Their car was destroyed in an accident when their daughter was driving it. Because of their poor credit history, the Howards could not even rent a car. They went to three banks and The Money Store to borrow $25,000 to satisfy their creditors, but were turned down.
One of the people Howard discussed his financial problems with was Diolosa, a salesman at a car agency Howard visited in his effort to rent a car. Howard testified that Diolosa offered to help him get a $25,000 mortgage loan, and that he thought all the subsequent paperwork was in furtherance of that loan. He thought he signed a mortgage and believed his $675 monthly payments to Diolosa were to satisfy it. Diolosa testified that what he offered and consummated was a purchase and leaseback of the property. The paperwork was all confirmatory of Diolosa's version. There was a contract, a deed, a buy-sell closing statement, a check from Diolosa marked "payment in full," and written confirmation that the transaction was a sale, signed by the Howards.
*227 The documents transferring title to Diolosa were full of lawyer talk, but the Howards had already been through a complicated real estate deal with Johnson. Mrs. Howard could not read English and had serious eye problems, but her husband was a high school graduate, and the couple were repeatedly warned orally and in writing by Diolosa's attorney that they were selling the house, that he did not represent them, and that they should consult an attorney of their own. They did not do so. Diolosa's attorney testified, truthfully as the judge found, that he fully explained the documents and the transactions to the Howards. A later monthly check to Diolosa was marked "rent" by Howard. He told an insurance man he sold his house. The evidence supported the judge's conclusion that the Howards knew that they were selling their house and renting it back, and that their contrary testimony was untrue.
Diolosa was in his mid-sixties. The car dealership of which he was half-owner had recently been sold, and he worked as a salesman at another agency. He said he had income of $20,000 per month and assets of more than $500,000. The judge found on the basis of Diolosa's self-evaluation that he was "obviously a successful business man." It is apparent, nevertheless, that the income and asset figures he put in his mortgage application were considerably inflated. The real estate, listed at $450,000, was the family home, actually owned by his wife. The $75,000 in furnishings were in the house.
The Howards thought their house was worth about $100,000, according to their 1985 loan applications. When Diolosa applied to the bank for his $100,000 mortgage in 1986, he thought its value was $75-100,000, according to his testimony, but on the mortgage application he stated its purchase price to be $125,000. The bank lent Diolosa $100,000 on the security of the property. The bank had an appraisal done, but the amount was *228 not revealed in the testimony.[2] The 1987 assessed value of the property was $227,200. On this fragmentary information, which was all that appeared in the evidence, the judge found that the fair value at the time of the January 1986 closing was $150,000 to $200,000.
The evidence about the lease arrangement was confused. The Howards' testimony did not help, because they denied the existence of any such arrangement, untruthfully according to the trial judge. Diolosa testified repeatedly that the arrangement was for the Howards to live in the house so long as they paid their rent. And yet he also testified that he told his lawyer to draw a five-year lease. The lawyer also so testified. Diolosa also said the $675 monthly rent was calculated at a level sufficient to pay his five years' debt service on the $25,000 he borrowed to pay the Howards plus current real estate taxes.[3] And yet the lease he instructed his lawyer to draw had an annual 10% rent increase, so that by the fifth year the Howards would have been paying $854 or $988 per month, depending whether the percentage increase was to be calculated on a simple or compound basis.
There actually was a lease document introduced into evidence. It was for five years, and used a printed apartment lease form. The monthly rent was $675 "during the first year, and shall increase 10% per annum during each year of this lease." The Howards were to pay all maintenance and utility charges, and real estate tax increases. There was no option to *229 renew or other reference to occupancy by the Howards after five years.
Diolosa testified he and the Howards discussed the lease terms at their first meeting in his attorney's office some weeks before the closing, and that he instructed the attorney to draw the lease. The attorney, however, testified the lease was not mentioned to him until the closing itself was in progress. At that point, it was too late to draft a lease and so the attorney told Diolosa to come back in a few days for it. He never did.
The lease was not signed by anyone. Neither Diolosa nor his attorney was asked why not; neither one was asked if an effort was made to pursue the matter with the Howards. Interestingly, there was no mention of a leaseback in the contract of sale. There was no mention in the deed of a retained estate or a continued occupancy. There was nothing in any oral or written communication from the attorney to the Howards before or at the closing, in his effort to get them to a lawyer or to avoid criticism of his own role, which in any way referred to occupancy or a lease.
If the deal had worked out as planned, Diolosa would have owned the Howards' house in five years, vacant. He would have received in rents either $46,700 or $49,450, depending on how the rent increase would have been calculated. He would have paid his $25,000 loan and the real estate taxes. He would have a home now worth $150,000 to $200,000 in five years without any personal outlay.
Of course, the deal could not work out. It did not require much financial acumen to see that if the Howards could not pay their credit card obligations even while not paying their real estate taxes, their proposed lease obligations were also beyond them. In only a few months, the inevitable occurred; the Howards stopped paying rent. There was no other foreseeable outcome.

*230 I.
The Chancery judge concluded that the Howard property was worth $150,000 to $200,000, and that a $25,000 purchase price was unconscionably low. However, the judge correctly stated that mere inadequacy of consideration would not justify relief, and that fraud, mutual mistake, undue influence, duress, unequal bargaining power or some other equitable ground must be demonstrated.
The judge concluded that because the Howards knew they were selling their home for a low price there was no fraud or mistake.[4] The absence of relationship of the parties prevented any finding of undue influence, see Haynes v. First Nat'l State Bank, 87 N.J. 163, 176, 432 A.2d 890 (1981), and the Howards' decision was not made under duress manufactured by Diolosa. The judge concluded, however, that the transaction was unconscionable, and the result of disproportionate bargaining power, which led to grossly unfair contractual terms. Jefferson Loan Co., Inc. v. Livesay, 175 N.J. Super. 470, 419 A.2d 1164 (Dist.Ct. 1980). We agree.
A contract is unenforceable if its terms are manifestly unfair or oppressive and are dictated by a dominant party. Kuzmiak v. Brookchester, 33 N.J. Super. 575, 111 A.2d 425 (App.Div. 1955). Plaintiff must demonstrate unconscionability by showing some overreaching or imposition resulting from a bargaining disparity between the parties, or such patent unfairness in the contract that no reasonable person not acting under compulsion or out of necessity would accept its terms. Rotwein v. General Accident Group & Cas. Co., 103 N.J. Super. 406, 417-418, 247 A.2d 370 (Law Div. 1968) (Handler, J.).
That is the case here. The Howards had been denied an institutional mortgage by four lenders. They thought their *231 financial salvation lay in a foolish and ruinous sale of their home for a fraction of its value, subject to an evanescent leasehold that continually escaped commitment to paper. Even if enforceable, the lease was not affordable. One way or another, the Howards were going to end up on the street in rather short order. And Diolosa knew it. He had access to funds and decided to solve the Howards' immediate problem at the price of their almost certain ultimate homelessness. For no personal outlay, Diolosa made a greedy deal that all but guaranteed him vacant ownership of the Howards' home. Equity exists to prevent such over-reaching.
Diolosa did pay $25,000. Ordinarily, rescission of the transaction would dictate returning the parties to their status quo. The Chancery Division judge ordered the Howards to repay Diolosa the $25,000 at the monthly rate of $675, the agreed amount of initial rent. Because of the unconscionability of the transaction, the judge ordered that the repayment obligation not include any interest.
The judge was on the right track, but overlooked the fact that the $675 rent was fixed, according to Diolosa, at a rate sufficient to service his $25,000 loan to the bank and also pay real estate taxes on the home. Since the judge correctly decided that Diolosa's interest costs should not be passed along to the Howards, and since the Howards are responsible for real estate taxes after rescission, and since $675 per month represents a difficult burden to the Howards, we think the rate of $675 too high. Five years of monthly payments of $416.67 each will repay $25,000 without interest. The judgment should be modified to reflect that obligation.
We note also that Diolosa apparently has not repaid Nanuet for his loans connected to these transactions. Although Nanuet crossclaimed against Diolosa, it never produced proofs on the crossclaim, and so the judgment dismissed the crossclaim without prejudice. The judge's opinion suggested that Nanuet *232 might seek to have the Howards' monthly payments made directly to it instead of Diolosa.
Diolosa not only has not repaid Nanuet but also has rendered himself judgment-proof by not holding any substantial portion of family assets in his name. If these circumstances remain true, the Howard payments should be redirected to Nanuet when it applies to the Chancery Division.

II.
The Chancery Division judge ordered the Nanuet mortgage on the Howards' house cancelled. We agree that the lien of the mortgage is subject to the Howards' title because the information furnished in Diolosa's mortgage loan transaction with Nanuet put the bank on notice of the voidability of the deed from the Howards to Diolosa.
A purchaser or mortgagee for value without notice, actual or constructive, acquires a title or lien interest free from all latent equities existing in favor of third persons. Bajek v. Polack, 120 N.J. Eq. 104, 107-109, 184 A. 212 (Chan. 1936). Constructive notice may be brought home to a mortgagee by known circumstances. See Henion v. Monahan, 110 N.J. Eq. 361, 363, 160 A. 566 (E. & A. 1932). If a purchaser or lienor is faced with extraordinary, suspicious, and unusual facts which should prompt an inquiry, it is equivalent to notice of the fact in question. Tantum v. Green, 21 N.J. Eq. 364, 367-369 (E. & A. 1869). See the various thoughtful opinions in Lesser v. Strubbe, 56 N.J. Super. 274, 152 A.2d 409 (Ch.Div. 1959), rev'd 67 N.J. Super. 537, 171 A.2d 114 (App.Div. 1961), aff'd o.b. 39 N.J. 90, 187 A.2d 705 (dissent at 91, 187 A.2d 705 (1963)). What facts did the bank know when it took Diolosa's mortgage?
Diolosa's account of his dealings with Nanuet was not disputed, and the judge's acceptance of it was based on sufficient credible evidence. Mr. Vecchio, Diolosa's contact at the bank, was not called as a witness, and no explanation was *233 offered for his absence. Diolosa had made a $25,000 personal loan from Nanuet to buy the Howard house. He then returned to make a written application for a $100,000 mortgage. He testified that he intended to pay off the personal loan out of the mortgage proceeds and build a house on an extra lot that he said came with the property. Diolosa's story was that he wrote $125,000 in the space for "purchase price" on his application after discussing it with Vecchio. It was Diolosa's estimate of the value of the entire property after the second house was built, and Vecchio told him to put it down as "purchase price." Diolosa told Vecchio that he had actually paid $25,000. He explained to Vecchio that the Howards were having financial problems and were going to lose the house, and so they sold it to Diolosa for $25,000 and could continue to live there as long as they paid rent. At that time Diolosa himself thought the property was worth $75-100,000.
The story Diolosa told Vecchio was an odd one.[5] But it was undisputed that he told it, and Nanuet acted on it. Nanuet knowingly agreed to take as security for a $100,000 loan a residential property, with a potential extra lot, just purchased from a distressed debtor for $25,000. The transaction might have been voidable as fraudulent to the Howards' creditors. It might have been subject to an enforceable leaseback on lenient terms. If it was, the lease was superior to the later mortgage, Carteret Properties v. Variety Donuts, Inc., 49 N.J. 116, 128, 228 A.2d 674 (1967), and significantly depressed the value of the property as security. Perhaps the lease was favorable but unenforceable, as, for instance, if Diolosa never presented it to the Howards for signature. Or perhaps the lease was unfavorable or even oppressive to the Howards. In those cases, it would not ameliorate the unconscionability of the purchase *234 price. Finally, although Diolosa said he intended to build to raise the property value enough to secure the loan, he did not ask for, and Nanuet did not grant a construction loan.
One way or another, the picture presented to Nanuet should have been a troubling one. Nothing about it made much sense. It should have alerted a potential mortgagee with knowledge of the terms described by Diolosa to the likelihood that Diolosa's purchase was irregular and voidable.
Bank loan officers are not detectives or social workers, and have no obligation to investigate an apparently regular transaction for latent defects or equities. This case is different. Here, Diolosa described to the loan officer a purchase transaction which all but screamed its irregularity and unenforceability. A bank can choose to take property for loan security in such circumstances, but only at the risk that its lien will be subject to the equities arising out of the irregular transaction whose likely voidability was revealed to the loan officer by the prospective borrower.

III.
Nanuet filed a third-party complaint against Diolosa's attorney, alleging that the attorney took the Howards' deed acknowledgement; that the Howards say they thought they were signing a mortgage; that the attorney had the duty to explain to the Howards the nature of the documents they were signing, and that if he negligently failed to do so, and as a result the deed was set aside, Nanuet would suffer substantial damages.
The judge found that the attorney explained the documents to the Howards and they understood them. Nanuet's loss therefore resulted not from the attorney's negligence in making explanations but from the unconscionability of the transaction and Nanuet's possession of facts that made its mortgage interest subject to the Howards' superior equities. *235 The bank claim against the attorney was therefore correctly dismissed.[6]
We do not address the Chancery judge's additional comments on the subject:
This does not mean that [the attorney] is entirely blameless. His actions (such as the letter he had plaintiffs sign) were motivated by self-protection rather than any concern for plaintiffs. He knew that the transaction was unconscionable. He had a moral and professional responsibility to refuse to participate unless the plaintiffs secured independent advice. But he breached no legal duty to plaintiffs, and therefore is not liable to the bank for indemnification or contribution.
We need not decide whether an attorney asked by a prospective client to represent him in a malodorous deal that would be revealed as unconscionable by a few pointed questions clears his skirts by having the unrepresented parties sign some disclaiming letters.[7] We also need not decide if an attorney in such circumstances is liable along with his client for the harm purposely done by the client to the unrepresented parties.
Except as modified, the judgment is affirmed.
NOTES
[1] The monthly payment figure is the total of the minimum payments plaintiffs stated in their December 1985 loan application to The Money Store.
[2] Since the loan did not involve stage payments based on construction progress, it is apparent that Nanuet's appraisal showed sufficient as-is value to secure a $100,000 loan.
[3] This testimony is itself something of a mystery. Diolosa said his monthly bank payment was $458 or $459. Such a payment would not amortize a $25,000 loan unless the interest rate were nominal. At 10%, the payment would be $531; at 7% it would be $495; at 0%, it would be $417. The Howards' real estate taxes were almost $3000, one-twelfth of which is $250, leaving $425 of each month's $675 payment for debt service.
[4] The theory was not pursued that the illusory nature of the lease was itself sufficient to justify a finding of fraud.
[5] If the property was worth $75-100,000, as Diolosa believed, it would hardly be worthwhile to borrow $100,000, pay off the earlier $25,000 note, and to spend $75,000 to build another house to raise the value of the property with two houses to $125,000.
[6] Nanuet's appeal is from the entire judgment, and this determination. Because Nanuet did not brief the matter, we could ignore it. Design-4 v. Masen Mountainside Inn, Inc., 148 N.J. Super. 290, 372 A.2d 640 (App.Div.), certif. den. 75 N.J. 6, 379 A.2d 235 (1977).
[7] The attorney testified that he thought from the price that the deal was for vacant land. He learned otherwise only when he received the survey which located a house on the land. He inquired of Diolosa, who said he got a good deal. The attorney inquired no further.

The contract of sale the attorney prepared is a very brief form and does not refer to structures or occupancy. It thus supports his testimony.