**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4440-17T1

A.P.T.,

     Plaintiff-Respondent,

v.

L.C.T.,[1]

     Defendant-Appellant.

_____

Argued telephonically April 3, 2019 –
Decided April 24, 2019

Before Judges Nugent and Mawla.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Burlington County, Docket No. FM-03-0589-15.

L.C.T., appellant, argued the cause pro se.

Krisden M. Mc Crink argued the cause for respondent (Mc Crink, Kehler & Mc Crink, attorneys; Rachel B. Costello, on the brief).

PER CURIAM

---

[1] We utilize initials to protect the parties' privacy.

Defendant L.C.T. appeals from a May 11, 2018 post-judgment order, which granted plaintiff A.P.T. enforcement of the parties' 2015 Property Settlement Agreement (PSA) and denied defendant's motion for relief from the PSA. We affirm.

We take the following facts from the record. The parties were married for nearly twenty-four years at the time plaintiff filed a complaint for divorce in November 2014. During the marriage, defendant worked as an attorney with the Office of the Public Defender (OPD). At the time of the complaint, defendant earned approximately $120,000 per year. For most of the marriage, plaintiff was a homemaker until she began work as a public school teacher in 2010. At the time of the complaint, she earned approximately $57,500 per year.

Two children were born of the marriage, both of whom have graduated college and are twenty-five and twenty-two years of age, respectively. Both children were attending college on a full-time basis, and resided on campus during the school term, as of the date of complaint.

As a result of the parties' marital difficulties, defendant consulted several OPD attorneys, all of whom suggested he retain matrimonial counsel. Defendant consulted a seasoned matrimonial attorney, but decided to represent himself in the negotiation of the PSA.

A-4440-17T1

Defendant, plaintiff, and her counsel, negotiated the PSA, which the parties signed on April 21, 2015. A final judgment of divorce was entered on June 8, 2015.

The PSA required defendant pay plaintiff fifty dollars per week in child support only when the children were home from college. It also required defendant to service the interest on an outstanding parent plus loan for the children that totaled approximately $37,000, and then pay it when the children graduated. In exchange, plaintiff assumed the joint credit card debt and a personal loan approximating $40,000.

The PSA further required defendant to pay $22,000 per year in "permanent" alimony until his retirement, which the parties stipulated would occur when defendant turned sixty years of age and completed twenty-seven years of service. The parties agreed defendant's alimony would reduce to $10,000 per year upon retirement. They further agreed as follows:

> This amount shall not be modifiable for any reason except as set forth below, including but not limited to: [defendant]'s retirement, disability, loss of assets, or otherwise. It is terminable only upon [plaintiff]'s cohabitation with an unrelated adult male and/or remarriage. The parties each acknowledge that this alimony provision is fair and equitable and the reason it is non-modifiable is due to [plaintiff]'s relinquishment of her larger claim of permanent alimony that would continue until such time as

A-4440-17T1

[defendant] would reach [the Social Security Act] retirement age [of sixty-seven]. His choice to retire early shall not result in a penalty for [plaintiff]'s compromise on this issue and in exchange, [defendant]'s obligation shall not be modifiable for any reason. [Defendant] shall use assets to pay his spousal support obligation if necessary and shall not be entitled to modification for any reason except [plaintiff's] cohabitation with an unrelated adult male or remarriage as set forth above. [Defendant] shall pay alimony . . . and after his retirement, he shall pay from his pension, with the funds being deposited into [plaintiff]'s bank account.

Additionally, any monies owed to [defendant] for unused sick time shall also be paid to [plaintiff] within thirty . . . days of his retirement in addition to all other payments as additional alimony in consideration for the other terms and conditions of this agreement. [Defendant] has approximately $10,000 worth of unused sick time as of the time of signing this agreement and shall continue to accrue more until he retires. [Defendant] may use his sick time liberally for actual illnesses and shall not purposefully dissipate same. Should [defendant] purposefully dissipate his sick time (with the exception of ordinary usage for actual sick days), [defendant] shall be required to pay [plaintiff] the difference up to $10,000 she is entitled to, within thirty . . . days of his retirement.

The PSA obligated the parties to pay the expenses associated with the marital residence from a joint account, so long as both remained in the house, and then contribute a pro-rata share of the expenses in the event they separated before its sale. Once the residence sold, plaintiff would receive the first $20,000

of proceeds, the next $20,000 would pay off a joint credit card, and the remaining proceeds were divided seventy-five percent to plaintiff, and twenty-five percent to defendant.

Regarding defendant's pension, the PSA stated:

> The expected draw from same will be approximately [$4400] per month, with [plaintiff] receiving [fifty percent] and the other [fifty percent] to [defendant], which [defendant] may use to pay [plaintiff] alimony. The parties agree that upon [defendant]'s death, [plaintiff] will receive the balance of the retirement account, if any, to secure [defendant]'s alimony obligation in addition to all life insurances on his life.

The PSA also noted plaintiff owned two pre-marital IRAs totaling approximately $120,000 and $14,000, respectively. The PSA acknowledged $2545 in the smaller IRA was non-marital and belonged to defendant, but noted the sum was satisfied without dividing the asset because plaintiff agreed to bear the joint credit card debt, which exceeded the college loan debt defendant agreed to bear by a similar amount.

In July 2015, approximately three months after the parties signed the PSA, defendant posted a public statement on Facebook critical of the OPD. Defendant claimed he was forced to retire due to his remarks. He claimed a grievance he filed resulted in a settlement with the OPD in which he agreed to retire on

September 1, 2017, "so that he could receive early social security and enjoy early retirement at [sixty-two] years of age[.]"

In August 2015, defendant purchased a two-bedroom co-op for $32,000 using funds from a pension loan he incurred after the date of complaint. The marital residence ultimately sold in September 2015, and the parties followed the PSA's terms regarding the distribution of its proceeds.

In July 2016, plaintiff's counsel sent defendant a letter advising plaintiff had learned defendant submitted the paperwork to begin drawing his pension. Defendant responded by letter in August 2016, acknowledging he had applied for the pension payments in accordance with the terms of the PSA. His letter also informed plaintiff he had three sick days remaining. He indicated "[t]he bulk of the sick days were used for recovery from surgeries during the last two years, as well as the entire month of March of this year for mental exhaustion." Plaintiff's counsel responded by reminding defendant the PSA stipulated the unused sick time was to be paid to plaintiff, and requested defendant provide proof of the illness which necessitated a one-month absence from work.

Defendant began to default on his alimony obligation under the PSA. In July 2017, he retained counsel who sent a letter to plaintiff's counsel seeking to modify alimony. The letter claimed the PSA was unfair and defendant lacked

A-4440-17T1

the competency to understand it, and attached a certification from defendant's therapist purporting to confirm this claim.[2] The letter further predicted the court would invalidate the alimony anti-Lepis[3] provision and claimed the agreed upon payment of reduced alimony post-retirement, plus plaintiff's receipt of her portion of the pension, constituted a windfall because the combined sum was larger than her pre-retirement alimony receipts.

Defendant retired on September 1, 2017, triggering the reduced alimony provision of the PSA and payout of one-half of the pension receipts to plaintiff in accordance with the PSA. Because defendant failed to pay alimony, plaintiff filed a motion to enforce litigant's rights in April 2018. Defendant, again without counsel, cross-moved asking the court to vacate the PSA.

Following oral argument, the motion judge signed an order granting the motion and denying the cross-motion. The judge made the following oral findings:

> As . . . defendant argued, he believed at the time he signed that [PSA] he would be able to enter private practice and make a significant amount of money which would pay for his reduction in pension. When you look at it, it doesn't shock the conscience. This was a

---

[2] The record before us does not include the alleged certification.

[3] Lepis v. Lepis, 83 N.J. 139 (1980).

negotiated agreement between the parties. The parties reviewed it. Defendant had ample opportunity to review this matter with counsel. He even took it to the [OPD] and people told him to get yourself a marital attorney. We don't handle these things. There's nothing in here that shocks the conscience. . . . This was a negotiated agreement.

Now, as we sit here three years later, . . . defendant is saying . . . that his bargain was inequitable. He shouldn't have made the bargain. Well at the time he made that agreement he signed it. He knew what was going to happen. It was obvious from this what was going to happen. These numbers were simple.

And this wasn't a situation where an individual had no idea what they were doing. This was an individual that was a skilled attorney arguing before the Appellate Division [and] . . . the Supreme Court at that time.

Lepis is very clear on how it works. And it's not exactly . . . difficult . . . for someone to read . . . what an anti-Lepis provision is. But even putting all that aside, looking at [Rule] 4:50, there's no . . . justification to vacate this [PSA]. . . . There's no fraud, . . . no misrepresentation, . . . no excusable neglect, . . . nothing to that effect.

All there is . . . is a letter from [defendant]'s treating counselor, who said, at that time she was treating him he was not competent to sign this. Now . . . the problem that I have . . . is if he wasn't competent to sign that agreement, he was not competent to enter in a representation of any of his clients at that time. And that is why I began the oral argument with the question, have there been any applications regarding any of that? And there has been none to that effect. . . .

8

Also, looking at . . . the totality of the circumstances, the [c]ourt has to look at the fact that there was an EEOC complaint filed subsequent to this [PSA]. And not that long after it . . . there was a settlement with the [OPD]; there was the execution of retirement paperwork. There were a significant amount of things that were going on in . . . defendant's life showing that he was, in fact, competent to proceed at the time he signed that [PSA].

A [PSA] which one party thinks is not equally fair to both parties is not justification to come back three years later and vacate that [PSA]. There's nothing in there that shocks the conscience. And this [c]ourt's not going to rule that an anti-Lepis provision is illegal, because it's not. It was bargained for by the parties. . . . The parties had ample opportunity. And if two people couldn't agree to it there was a right for a trial.

. . . I don't place credibility in anything that defendant argued as to what was going on.

The judge concluded the agreement was fair and equitable. He provided written findings, which mirrored his decision. After defendant filed this appeal, the judge entered a supplementary order amplifying his earlier findings. We now address the issues raised on this appeal.

## I.

[F]indings by a trial court are binding on appeal when supported by adequate, substantial, credible evidence. Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). . . .

If the trial court's conclusions are supported by the evidence, we are inclined to accept them. Ibid. We

9

do "not disturb the 'factual findings and legal conclusions of the trial judge unless . . . convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Ibid. (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 484 (1974)). "Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark'" should we interfere to "ensure that there is not a denial of justice." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007)).

[Gnall v. Gnall, 222 N.J. 414, 428 (2015).]

Defendant asserts similar arguments to those made to the motion judge. Summarizing them, defendant claims the motion judge's failure to vacate the PSA on grounds it was unconscionable, defendant's lack of competency, and duress, constituted reversible error. He argues even if the failure to vacate the PSA was not an error, the judge should have: 1) terminated alimony because of defendant's inability to pay plaintiff from both the pension and alimony; 2) terminated his college payment obligations because he had no child support obligation, no ability to pay, and was estranged from the children; and 3) declined to enforce the obligation to pay plaintiff for the sick time because plaintiff did not meet her burden to prove defendant misused the sick time.

A-4440-17T1

A.

The decision whether to grant a motion for relief from a final judgment under Rule 4:50-1 "is left to the sound discretion of the trial court[.]" Mancini v. EDS ex rel. N.J. Auto. Full Ins. Underwriting Ass'n, 132 N.J. 330, 334 (1993). "The rule is 'designed to reconcile the strong interests in finality of judgments and judicial efficiency with the equitable notion that courts should have authority to avoid an unjust result in any given case.'" US Bank Nat'l Ass'n v. Guillaume, 209 N.J. 449, 467 (2012) (quoting Mancini, 132 N.J. at 334). "The trial court's determination . . . warrants substantial deference, and should not be reversed unless it results in a clear abuse of discretion." Ibid. An abuse of discretion occurs "when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Id. at 467-68 (quoting Iliadis v. Wal-Mart Stores, Inc., 191 N.J. 88, 123 (2007)).

Defendant asserts the PSA was unconscionable because it gave plaintiff windfalls, namely: fifty percent of the pension and alimony, defendant's full pension upon his death, it required defendant to re-pay the entire pension loan he utilized to purchase the two bedroom co-op while plaintiff received the entire $20,000 proceeds from the sale of the marital home, and it failed to disclose

plaintiff's future anticipated retirement benefits and inheritance. Alternatively, defendant argues the anti-Lepis provision is invalid because his retirement was involuntary and was not a reasonably foreseeable changed circumstance.

Unconscionability exists when there is "overreaching or imposition resulting from a bargaining disparity between the parties, or such patent unfairness in the contract that no reasonable person not acting under compulsion or out of necessity would accept its terms." Howard v. Diolosa, 241 N.J. Super. 222, 230 (App. Div. 1990) (citing Rotwein v. Gen. Accident Grp. & Cas. Co., 103 N.J. Super. 406, 417-18 (Law Div. 1968)). The characteristics of unconscionability are: "(1) unfairness in the formation of the contract, and (2) excessively disproportionate terms." Sitogum Holdings, Inc. v. Ropes, 352 N.J. Super. 555, 564 (Ch. Div. 2002). "[T]hese two elements [have been described] as 'procedural' and 'substantive' unconscionability." Ibid. Substantive unconscionability "suggests the exchange of obligations [is] so one-sided as to shock the court's conscience." Id. at 565.

Pursuant to N.J.S.A. 2A:34-23, courts have the power to modify alimony and support orders at any time. The supporting spouse can seek to modify his or her alimony obligation upon a showing of "changed circumstances" that warrant relief from the alimony. Lepis, 83 N.J. at 157. In order to establish a

A-4440-17T1

prima facie showing of changed circumstances, the supporting spouse "must demonstrate that changed circumstances have substantially impaired the ability to support himself or herself." Ibid.

Notwithstanding, parties are free to enter into agreements departing from the general Lepis rule and establish their own standards by which they agree to be guided in cases involving "reasonably foreseeable future circumstances[.]" Morris v. Morris, 263 N.J. Super. 237, 241 (App. Div. 1993). Anti-Lepis provisions, which purport to waive the right to future modification, are enforceable in certain circumstances, unless the agreement is "unreasonable" and are modifiable in "extreme cases." Id. at 246. The party seeking modification has the burden of demonstrating changed circumstances to warrant relief from his or her obligation.

The PSA was not unconscionable in any respect. Its terms were clear, bargained for at arms-length, and recite the consideration given for each provision. Indeed, the reduced alimony provision enabled defendant to retire sooner than he otherwise could have, had he not settled the case. Moreover, the anti-Lepis provision shielded defendant because it confined plaintiff's ability to realize alimony to $10,000 per year, regardless of whether defendant ceased to practice law following his retirement. As the motion judge noted, the provision

protected both parties because "[t]he reduction in post-retirement alimony provided a safeguard to . . . plaintiff should . . . defendant retire early . . . [and] plaintiff took a reasonable precaution to protect her standard of living realizing what could occur."

Furthermore, defendant's arguments regarding the pension conflates alimony with equitable distribution. Plaintiff's receipt of her share of the pension was her equitable distribution and not alimony paid from defendant's income. Similarly, plaintiff's right to receive the pension in the event defendant pre-deceases her was to satisfy defendant's alimony obligation. Plaintiff did not receive a windfall.

Contrary to defendant's argument, the PSA's alimony provision explicitly contemplated his early retirement. It stated: "The parties understand that [defendant] seeks to retire as early as the age of [sixty]." We agree with the motion judge's finding the PSA settled "the issue of retirement," namely, that "defendant executed a [PSA] that did not encompass voluntary . . . or involuntary retirement. The agreement only lists retirement." As the judge found, "this was not an accidental retirement benefit due to infirmity, but a standard retirement. . . . [D]efendant submitted an application to the State of New Jersey

14

Division[] of Pensions and Benefits. The retirement came in response to a complaint . . . defendant filed against the New Jersey [OPD]."

We also reject defendant's argument the PSA is invalid because it requires him to pay a $35,000 pension loan he used to purchase his home. Defendant incurred the pension loan post-complaint and it is not marital debt. See Painter v. Painter, 65 N.J. 196, 218 (1974) (holding "for purposes of determining what property will be eligible for distribution the period of acquisition should be deemed to terminate the day the complaint is filed").

We are unpersuaded the PSA was invalid because plaintiff allegedly received the "entire proceeds of the sale of the marital house in the amount of some $20,000." As we noted, the PSA allotted the first $20,000 of proceeds to plaintiff, but also required payment from the remainder to satisfy joint marital debt before dividing the rest between the parties. Moreover, plaintiff's receipt of this sum did not render the PSA invalid because an equitable distribution does not presume an equal distribution. See Rothman v. Rothman, 65 N.J. 219, 232 n.6 (1974).

Additionally, the PSA was not unconscionable because it failed to recite and consider assets "[p]laintiff inherited from her father . . . during the marriage[.]" Property "acquired during the marriage . . . by either party by way

15

of gift, devise, or intestate succession shall not be subject to equitable distribution[.]" N.J.S.A. 2A:34-23(h). Any separate "property owned . . . at the time of marriage will remain [] separate property of such spouse and . . . will not qualify as an asset eligible for distribution[,]" Elrom v. Elrom, 439 N.J. Super. 424, 444 (2015) (first three alterations in original) (quoting Painter, 65 N.J. at 214), provided "[i]t was segregated throughout the marriage and clearly was never intended to benefit the" other spouse. Wadlow v. Wadlow, 200 N.J. Super. 372, 381 (App. Div. 1985). Defendant concedes the inherited assets did not fund the marital standard of living, and there is no evidence to refute the assets were segregated during the marriage.

Defendant also argues the PSA was unconscionable because it failed to distribute plaintiff's "anticipated" retirement benefits, namely her teacher's pension. We disagree. Defendant was aware plaintiff had a pension because she had been working as a teacher for approximately three and one-half years as of the date of complaint. Furthermore, the pension was six and one-half years from vesting. Under these circumstances, defendant's failure to bargain for a share of this contingent benefit and the failure to adduce any evidence of its value does not convince us the PSA is invalid.

A-4440-17T1

B.

Defendant asserts he was "incompetent, legally and mentally, during the genesis of the PSA." He argues he signed the PSA under duress because plaintiff and her attorney orchestrated an unfair agreement containing "windfall features" while defendant was recuperating from surgery, medicated, and dependent on plaintiff for assistance. These contentions are unsupported by the record.

Defendant presented the motion judge with a document prepared by his treating therapist, which purportedly certified he lacked the capacity to enter into the PSA.[4] The judge rejected the document because it was not a report or examination prepared by an independent medical professional, but rather a therapist with whom defendant had a patient-therapist relationship. More importantly, the judge noted defendant's alleged condition did not prevent him from performing his work related duties as a successful appellate attorney for the OPD. Defendant told the judge he represented approximately forty clients at the time he entered into the PSA. None of them had complained about his competency. He also never reported his alleged incompetency to the OPD.

The credible evidence in the record supports the motion judge's conclusion defendant did not lack the capacity to enter into the PSA. The totality of the

---

[4] The record before us lacks the document from the therapist.

circumstances demonstrate defendant did not meet his burden to establish he was not competent to settle his divorce.

Similarly, a court considering a claim of duress must consider all the attendant circumstances. Shanley & Fisher, PC v. Sisselman, 215 N.J. Super. 200, 212 (App. Div. 1987). In addition to considering the subjective mindset of the complaining party, the pressure imposed must be wrongful. Rubenstein v. Rubenstein, 20 N.J. 359, 367 (1956). "The act or conduct complained of . . . [must be] 'so oppressive under given circumstances as to constrain one to do what his free will would refuse.'" Ibid. (quoting First State Bank v. Fed. Reserve Bank, 219 N.W. 908, 909 (Minn. 1928)); see also Segal v. Segal, 278 N.J. Super. 218, 223-24 (App. Div. 1994).

There is nothing in the record to support the notion plaintiff or her counsel wrongfully pressured defendant to sign the PSA. Defendant had the opportunity to consider and negotiate the terms of the PSA, and consult with attorneys before signing the agreement.

## C.

Aside from the arguments under Rule 4:50-1, defendant claims the motion judge should have granted relief from the PSA on the basis of a change in circumstances. Specifically, he asserts he is entitled to a modification of his

alimony and college obligations because his retirement was unexpected and left him without the ability to pay.

The judge stated: "[D]efendant's belief that early retirement is a changed circumstance warranting modification of the [PSA] is incorrect. The [PSA] contained a provision for early retirement and lowered . . . defendant's alimony obligation while extending the term of alimony. There was no change in circumstances warranting modification." Because we have upheld the motion judge's findings that defendant's early retirement was known at the time the parties signed the PSA, and have upheld the validity of the PSA's anti-Lepis provision, we decline to further address defendant's argument the motion judge should have modified the agreement pursuant to Lepis.

Defendant claims he has no legal obligation to contribute to the children's college expenses because the PSA "unequivocally indicates that the two adult children 'are emancipated.'" Additionally, he argues his obligation should be modified because his retirement has rendered him unable to pay, and since he lacks a relationship with the children, he should not have to pay their college expenses.

The parties' PSA inartfully noted the children were emancipated for purposes of child support, but then required defendant to pay plaintiff support

when the children were home from college. However, defendant does not challenge the child support payment, but instead the college contribution obligation. In this regard, the parties crafted a separate paragraph clearly outlining defendant's obligation to pay the college loan and further agreed "they will be responsible for their children's college education for a total of four . . . years, consecutive, full-time attendance and shall not require the other to pay, contribute or sign a loan for any additional collegiate expenses for any of their children after that timeframe." As with his arguments regarding alimony, defendant has not demonstrated a change in circumstances warranting a modification of any of his obligations. We decline to invalidate this bargained-for provision.

D.

Finally, defendant claims the court erred in awarding plaintiff $10,000 for defendant's unused sick time. He argues he used the medical leave in good faith. He asserts it was plaintiff's burden to prove he used the sick time in bad faith and the judge erroneously shifted the burden.

Plaintiff argued the sick leave was utilized in March 2016, during a time defendant claimed he was absent from work for the entire month to recover from mental exhaustion. She argued defendant knew he was retiring in July 2016,

20

and purposefully dissipated his remaining unused sick time beforehand. The motion judge agreed and found defendant had used the sick time in bad faith.

Although the motion judge may not have detailed his findings regarding this issue, defendant presented no objective medical evidence to support his claim of mental exhaustion.[5] Therefore, the judge's enforcement of the clear terms of the PSA under these circumstances was not an abuse of discretion.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[5] Although it is not essential to decide this issue, it is clear to us defendant carried the burden to establish his use of the sick time was legitimate, as he was responsible for applying to the OPD in order to take the time. N.J.R.E. 101(b)(1) and (2).